THE FOLLOWING ORDER
IS APPROVED AND ENTERED
AS THE ORDER OF THIS COURT:

DATED: June 20, 2012



_____
Honorable Pamela Pepper
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

---

IN RE:    DIANE JACKSON,                Case No. 12-25456-pp

                    Debtor.             Chapter 13

---

**ORDER IMPOSING SANCTIONS ON ATTORNEY EMORY H. BOOKER, III
FOR VIOLATIONS OF THE BANKRUPTCY CODE AND RULES**

---

I.    <u>Factual History</u>

    A.    *Milwaukee's Peculiar Issues*

    On September 21, 2011, the Milwaukee Journal Sentinel reported that
Milwaukee's poverty rate for 2010 was 29.5%, up from 2009. For the 2010
census year, Milwaukee was listed 8th on the list of the ten poorest cities in the
nation. The Journal Sentinel article stated that some 41.4% of Milwaukee's
African American residents lived below the poverty threshold. Various reports
over the past two years have indicated that Milwaukee County has the highest
poverty rate in the state of Wisconsin.

    The above-captioned debtor's case, and others that will be referenced in

1

this order, reflect one particular aspect of the stranglehold in which poverty holds many Milwaukee residents. Electricity is critical to modern life–it powers lights, refrigerators, electric stoves, microwave ovens, cell phone chargers, televisions. For many urban residents, it powers water heaters and furnaces. If a resident were unable to pay her electric bill, and the utility provider were to terminate her service in, say, December, that resident (and her children) would have no way to refrigerate food or to cook and light her apartment in winter's most bitter months, and possibly would have no hot water or heat in months when temperatures have been known to drop to ten degrees or more below zero.

In recognition of this reality, the Wisconsin Public Service Commission imposes regulations on the disconnection of critical utility services. First, the regulations specify the following about termination of electric or gas service to customers whose income falls below a certain percentage of the poverty guideline:

> Conditions for disconnection. A utility may disconnect only those households whose gross quarterly incomes are above 250% of the federal income poverty guidelines and where health and safety would not be endangered because of the infirmities of age, developmental or mental disabilities or like infirmities incurred at any age or the frailties associated with being very young, if service were terminated or not restored.

PSC 113.0304(4); PSC 134.0624(3).

These provisions apply year-round to the utility companies' ability to

disconnect service.

Second, there are specific provisions for disconnections during "cold weather."

> (1)  Declaration of policy. The public service commission of Wisconsin recognizes that there are many citizens of the state who, because of income, infirmities of aging, mental retardation, other developmental or mental disabilities or like infirmities incurred at any age, or the frailties associated with being very young, need protection from cold weather disconnections. This section is intended to provide that protection as enumerated below. It is the further intent of the public service commission that these rules be used as guidelines to identify those customers who are not covered by [sub. (4) in PSC Ch. 113 and sub. (3) in PSC Ch. 134]. For households subject to disconnection under this section, any disconnection permitted by this chapter during the cold weather period defined below shall be made only as a last resort, after all other legal means of recourse have been attempted and proven unsuccessful.

PSC Ch. 113(4); PSC Ch. 134(3).  The regulations further state, "This section applies to disconnections for nonpayment of utility service which provides the primary heat source or energy source affecting the primary heat source to residential dwelling units occurring during the period November 1 to April 15 in any year for all occupied residences."  PSC 113.0304(2)(a); PSC 134.0624(2)(a).

Thus, for residents whose incomes fall below 250% of the poverty guideline, the utilities may not disconnect services between November 1 and April 15 for non-payment of utility bills except as a "last resort."

Because the utility services do not disconnect immediately upon non-payment, some of Milwaukee's most financially distressed residents will already

3

have accrued arrearages, late fees and penalties by the time the winter disconnection "moratorium" goes into effect. While the utilities cannot disconnect the services for these residents during the moratorium months, the bills for the electricity and gas used during those months continue to accrue, along with the same late fees and penalties. On April 15, when the moratorium is lifted, these residents face immediate disconnection unless they can either come up with the money they owe (the courts have seen bankruptcy debtors who owe $10,000 or more in utility bills) or find some other alternative.

Until recently, one other alternative for a resident who faced post-moratorium disconnection was the possibility of filing a "voluntary proceeding[] by wage earner[] for amortization of debts" pursuant to Wis. Stat. §128(21)–commonly known as a "Chapter 128 filing." A Chapter 128 filing is a state-court proceeding in which wage earners who can't pay a debt in full can make regular debt amortization payments over time. A Chapter 128 filing does not provide a debtor with the same protections as a Chapter 7 bankruptcy, but subsection (2) of §128.21 does state that

> [a]fter the filing of a petition under this section and until the dismissal of the proceedings, no execution, attachment or garnishment may be levied or enforced by any creditor seeking the collection of any claim which arose prior to the proceeding, unless such claim is not included by the debtor in the claims to be amortized . . . .

Wis. Stat. §128.21(2).

WE Energies, the utility company which provides electrical service to

Milwaukee residents, had for years treated the filing of a Chapter 128 petition as it was required to treat the filing of a bankruptcy petition–in other words, as an injunction preventing it from terminating a customer's service during the pendency of the case. On August 25, 2011, however, Milwaukee County Circuit Court Judge William Pocan held that while §128.21(2) prohibits a creditor–including WE Energies–from "executing," or "attaching," or "garnishing" a debtor's wages or assets, it did not include a "stay" of any and all of a utility provider's actions or attempts to collect the debt, the way the "automatic stay" in bankruptcy does. Thus, Judge Pocan found, the fact that a WE Energies customer filed a Chapter 128 petition did not stay WE Energies from disconnecting a customer's service for non-payment.

As of August 25, 2011, therefore, a WE Energies customer facing termination of her utilities could not prevent that termination by filing a Chapter 128 petition. The only place in which that customer could initiate a court action that would result in WE Energies being barred from disconnecting service was the federal bankruptcy court.

Judge Pocan issued his ruling a couple of months before the 2011 moratorium on disconnections went into effect. When April 15, 2012 arrived (actually, April 16, because April 15, 2012 fell on a Sunday), for the first time in years, WE Energies customers who faced post-moratorium disconnection could not prevent that disconnection by filing a Chapter 128 proceeding. They could obtain injunctive relief only by filing a Chapter 7 bankruptcy petition in

5

federal court.

It is in the context of this unique historical situation that it appears that Attorney Emory H. Booker, III began, sometime around April 13, 2012–three days before the moratorium was due to be lifted–to conduct the "suitability analyses" and "debt relief programs" that are the subject of this order.

B. *Attorney Booker's History with the Bankruptcy Court*

The records for the Bankruptcy Court for the Eastern District of Wisconsin show that Attorney Emory H. Booker, III first appeared as counsel of record in the Eastern District of Wisconsin in case number 10-30687, filed June 28, 2010. The debtor in that case was Booker Law Group, LLC, Attorney Booker's own law firm. The case was dismissed for failure to appear at the meeting of creditors.

On the same date that Booker Law Group filed for bankruptcy, Attorney Booker filed his own personal Chapter 13 bankruptcy petition. The trustee in Attorney Booker's individual case objected that Attorney Booker was not eligible to be a Chapter 13 debtor, and moved to dismiss; the Court granted that motion, and dismissed the case on September 10, 2010, but stayed the effective date of the order to give Attorney Booker an opportunity to convert. A few days later, Attorney Booker filed a motion to convert the case to one under Chapter 7, and he received a Chapter 7 discharge on December 23, 2010.

Attorney Booker then began appearing as attorney of record for other Chapter 7 and 13 debtors (as well as filing two other cases for himself–a

6

Chapter 13 case dismissed on May 6, 2011 for failure to make plan payments, and a Chapter 13 case dismissed on September 2, 2011 for failure to file required documents by the statutory deadline). The four judges in the district began to encounter problems with the cases Attorney Booker had filed–the debtors would write to the judge, for example, complaining about things that had happened in their cases of which they were not aware, or stating that they did not know that their cases had been dismissed or that they did not have an automatic stay in place. (*See, e.g.*, case no. 11-25841, Castaneda; case no. 11-26081, Guthrie; case no. 11-30018, Jorgenson.) One debtor almost lost her car to repossession, until she found new–experienced–Chapter 13 counsel, who assisted her in dismissing the case Attorney Booker had filed and filing a new, clean Chapter 13 petition. *See* case no. 11-30018, Jorgenson.

It is not unheard of for debtors to write to judges even though they are represented by counsel. Occasionally a debtor doesn't understand that the attorney still represents him because some time has passed since he last saw the lawyer, or perhaps the debtor is writing to complain about something the lawyer has done. Clients can sometimes disagree with the best of attorneys–one size does not always fit all when it comes to matching attorneys and clients, and most lawyers have, at one time or another, had a disgruntled client write a letter to a judge.

There is, however, a difference between a lawyer who has an occasional unhappy client punctuating years of otherwise satisfactory practice, and a

7

lawyer who has problems arise in the majority of cases he files. It began to appear that the latter was the case with regard to Attorney Booker, and the judges began to order him to appear in court, so that they could determine why they were seeing so many issues in his cases. As a result of these hearings, the judges became convinced that Attorney Booker was not experienced enough in bankruptcy law–particularly with regard to the 2005 amendments to the Code–to adequately protect his clients' interests. Some judges suggested that he find a mentor attorney to assist him, given that he appeared to be trying to break into the bankruptcy area. They suggested that he take continuing legal education classes on bankruptcy law topics. Members of the clerk's office staff and chambers staff attempted to assist him in learning the electronic filing system and in dealing with procedural issues.

The problems continued, however, causing the judges to conclude that these recommendations were not bearing fruit. Accordingly, on December 20, 2011, the four judges issued an order barring Attorney Booker from filing any further bankruptcy petitions in the Eastern District of Wisconsin until he had demonstrated to the judges that he had obtain fifteen (15) hours of continuing legal education in the area of consumer bankruptcy practice. Between December 20, 2011 and February 2012, the Court did not receive any petitions which listed Attorney Booker as counsel of record.

On February 17, 2012, Attorney Booker filed verification with the Court that he'd obtained twenty-three (23) hours of consumer bankruptcy legal

education.  Accordingly, on March 5, 2012, the judges reinstated Attorney Booker's privileges to file new bankruptcy petitions.  Strangely, however, the judges did not see Attorney Booker appearing as counsel of record in new cases.

Around April 13, 2012 or so, the clerk's office began to receive petitions which indicated that they had been prepared by Crystal Neal 1st Choice Bankruptcy Preparation, Laotto, Indiana.  On April 13, 2012 alone, eleven cases were filed in which the petitions had been prepared by 1st Choice.  In these cases, the debtors owed significant sums to WE Energies.  None of the petitions indicated that an attorney had been involved in their preparation.

Several days later, two different debtors came into the clerk's office to file their petitions, both of which indicated they'd been prepared by 1st Choice Bankruptcy Petition Preparation.  In response to some routine questions by the clerk's office staff, both debtors responded that they did not know the answers to the questions because their "lawyer" had taken care of the papers.  The clerk's office staff pointed out that there was no lawyer listed anywhere on the petition, schedules or other documents.  The debtors responded that their lawyer was Attorney Booker.

Given the obligations the Bankruptcy Code places on attorneys who represent debtors in bankruptcy, this turn of events–petitions which did not reveal an attorney's participation, filed by debtors who claimed they were represented by counsel–caused the judges concern.  Almost every business day

9

in April and early May, at least one–often many–debtors would file petitions which purported to have been prepared by 1ˢᵗ Choice.  Many of these debtors also filed applications asking the Court to waive the $306 Chapter 7 filing fee.  Some of the judges hold hearings on such fee applications as a matter of course; the others began to schedule such hearings out of concern over the possibility that these debtors had paid an attorney who had not disclosed that fact on the paperwork.

By mid- to late May, over 100 petitions had been filed which listed 1ˢᵗ Choice as the petition preparation service.  All four of the judges held hearings with debtors who stated that Attorney Booker (some referred to as "The Light Hero") was their lawyer.

The debtors testified that they'd learned about Attorney Booker's services in different ways–some had seen signs posted on street lights in their neighborhoods.  Others had received text messages, or actual telephone calls advertising The Light Hero's services.  Still others had seen an ad in a local television guide.  The judges have one of the light pole ads–it is a neon yellow foam board with black text, and shows a cartoon drawing of a light bulb, smiling.  Above the light bulb appear the words, "Feels Good to Have Power!" Below the light bulb, the text reads, "Light Hero Don't be a We Energies Victim! 414-751-8405 Stay Connected.  Get Connected."  There is no mention of Attorney Booker, of the fact that he is a licensed attorney, or of the words "bankruptcy" or "debt relief."

10

The debtors also interacted with Attorney Booker in different ways. Some debtors called the number on the ad, and spoke to Attorney Booker himself or a "staff member." Some went to an office in downtown Milwaukee. Some of those who went to the office actually met with Attorney Booker one-on-one. He addressed others in a group. Still others met with someone on his "staff." With some debtors, Attorney Booker pulled up their credit reports. Other debtors did not mention this. Some debtors said that Attorney Booker went over a questionnaire with them. Others stated that they completed the questionnaire themselves.

Other debtors testified that they never had met Attorney Booker. When these debtors called the number in the ad, they were told to go to a local UPS store, or–in the case of debtors who lived in the Racine area–to Landmark Title Insurance, to pay the money Attorney Booker charged them, and to pick up a packet of materials. They were to complete a questionnaire contained in the packet, and return it to the UPS store or Landmark Title, then await receipt of their completed papers, which they were to file themselves.

Debtors reported different payment arrangements with Attorney Booker. As far as the judges have been able to tell, Attorney Booker charged between $220 and $450 per debtor–it is not clear how Attorney Booker decided which debtors would pay which amounts. Some debtors understood that the amount Attorney Booker charged them covered everything. Other debtors stated that they paid one amount to Attorney Booker, and an additional amount ($75) to

11

"the person who filled out the papers."  A number of debtors were able to produce receipts–signed by Attorney Booker.  The receipts would indicate that the service for which the debtors had paid Attorney Booker was a "suitability analysis," or a "debt relief program."  None of the receipts mentioned bankruptcy, or legal services.

The debtors also appeared confused about what, exactly, they had retained Attorney Booker to do.  Several stated that they understood that they were representing themselves, and that they'd paid Attorney Booker to give them the paperwork, and then to have the papers typed up.  Others appeared to believe that they'd hired Attorney Booker to represent them as their lawyer.  For example, when some judges asked why, if the debtors had hired Attorney Booker to represent them, he was not present in court with them, several debtors expressed surprise that Attorney Booker had not appeared.  Some debtors were aware that there was a petition preparer involved in typing their papers.  Others had never heard of 1st Choice or Crystal Neal, and had no idea that anyone other than Attorney Booker had been involved in preparing their petitions.

When a judge waives the Chapter 7 filing fee for a debtor, the panel trustee who administers the case does not get paid, so judges take care to waive those fees only when it appears that the debtor truly cannot pay.  At a number of the hearings on the fee waiver applications filed in the 1st Choice cases, debtors expressed surprise over the financial information contained on

their bankruptcy schedules.  The schedules sometimes listed income from jobs debtors no longer had (and hadn't had at the time they'd filed for bankruptcy), or listed incorrect financial information, or listed assets the debtors didn't have.  When asked whether they'd discussed the schedules with Attorney Booker after receiving them, most had not done so.  When judges would ask where the debtors had come up with the money to pay Attorney Booker (when they were arguing that they could not pay the filing fee for the bankruptcy), they gave different answers–some responded that they'd borrowed the money, some had taken it out of Social Security, disability, or W-2 checks, some had used tax refunds, some had taken it from wages.

Some debtors told members of the clerk's office staff that Attorney Booker had told them they didn't have to include cars or mortgage payments on their schedules.  Some indicated that Attorney Booker had informed them that he could assist them in reaffirming debts after the meeting of creditors.

The Eastern District bankruptcy court is a small one–only four judges. The hearings the judges hold are public, and are recorded.  The judges talk with each other frequently.  As each judge held hearings, the other judges learned more about the experiences debtors were having with Attorney Booker, and about the practices he was employing.  Accordingly, the judges began to order Attorney Booker (and, in some cases, petition preparer Crystal Neal) to appear and answer questions about these practices.

As of this writing, there have been approximately 147 petitions filed since

13

April 13, 2012 in which Attorney Booker was retained for a "suitability analysis," and 1st Choice was the document preparer.

C.    *Facts of the Current Case*

On April 19, 2012, someone filed a Chapter 13 voluntary petition on behalf of debtor Diane Jackson. The petition indicated on page 2 that the debtor had had a previous bankruptcy case filed in 2004, but did not list the case number of that previous case. Page 3 of the 2012 petition indicated that the petition was prepared by "Crystal Neal 1st Choice Bankruptcy Preparation," located in Laotto, Indiana. The petition preparer dated the petition April 17, 2012, twelve days before the petition was filed with the clerk's office. The preparer disclosed that she had been paid $75 to prepare the debtor's petition and schedules.

Schedule B listed as the debtor's assets a $550 security deposit, furniture valued at "unknown," and a television valued at "unknown." Schedule E showed one priority claim to the IRS in an unknown amount. Schedule F (where a debtor lists unsecured debts) showed medical debts, and few thousand dollars of debt to Wisconsin Electric Power ("WE Energies"). On question 4 of the Statement of Financial Affairs, the debtor indicated that Wisconsin Power had a judgment against her. On question 9 of the Statement of Financial Affairs, the debtor indicated that she'd paid Crystal Neal $75, but made no mention of any fees paid to an attorney or law firm. Nowhere on the petition or schedules was there any indication that the debtor had had an

14

attorney's assistance in connection with filing the case, or that she'd paid anyone other than Crystal Neal in connection with preparing her bankruptcy papers.

The following day, on April 20, 2012, the clerk's office made a notation on the record that the debtor had filed a previous case. The court staff checked the docket, and discovered that on April 17, 2009, the debtor–represented by an experienced Chapter 13 attorney–had filed a Chapter 13 petition. As of April 19, 2012–the date the debtor had filed the petition in the above-captioned case–the 2009 case (09-25256-pp) remained open and active.

Because of the 7th Circuit's decision in In re Sidebottom, 430 F.3d 893 (7th Cir. 1005) ("Although the courts have differed with respect tot he permissibility . . . 'simultaneous Chapter 20' cases, there is general agreement that a debtor may not maintain two or more concurrent actions with respect to the same debts."), on April 23, 2012, this Court issued an order dismissing the above captioned case, because the debtor already had a Chapter 13 case open and active when she filed the instant petition. At the same time, the Court issued an order to show cause, requiring Attorney Emory H. Booker, III (as well as petition preparer Crystal Neal) to appear and show cause why he should not be sanctioned for violations of the Bankruptcy Code.

On May 22, 2012, the Court held a hearing on the Show-Cause order, at which both Attorney Booker and petition preparer Crystal Neal appeared. (Ms. Neal appeared, with the Court's permission, by telephone.) The above-signed

questioned Attorney Booker extensively, as did counsel for the U.S. Trustee, and Attorney Booker provided narrative testimony.

Attorney Booker informed the Court that he was 42 years old, and currently owned Legacy Legal Group, which he had incorporated one year previously. He stated that Legacy Legal Group did not have any employees. He did note that he had some "independent contractors" who provided him certain assistance. For example, someone named Alvin Brewer provided him with marketing services, and sometimes answered his telephone. (Alvin Brewer does not reside in Milwaukee, but lives in the Atlanta area. At a later point in the hearing, when counsel for the U. S. Trustee asked Attorney Booker about the fact that a letter he'd written a debtor in a previous case referred to him as an "Award-Winning" attorney, he indicated that he'd been named Attorney of the Year by Millennium Capital Management. Millennium Capital Management is located in Smyrna, Georgia–a Kalvin Brewer is employed there.)

Attorney Booker stated that he was licensed in Wisconsin, Texas, Illinois and Michigan. When the Court questioned him further, Attorney Booker clarified that he held a Wisconsin law license, but had been admitted to practice in particular federal district courts in Texas, Illinois and Michigan.

He stated that he had done his undergraduate work at Florida A&M, and had graduated from the University of Wisconsin Law School in 1997. After graduation, he'd take a position with the drug company, Pfizer, in its sales department. He stated that he had worked for a number of drug companies in

16

the past, including Eli Lilly and Pfizer. In the year 2000, he had joined the Milwaukee County District Attorney's Office as a line assistant. He remained in this position for approximately 18 months. He stated that he left the DA's office because he received a "more lucrative" offer working as a marketing executive for GlaxoSmithKline, another drug manufacturer. When Attorney Booker left GlaxoSmithKline for unspecified reasons, he opened his solo firm, Booker Law Group. He operated this practice for approximately nine years; he testified that it was "still open."

Attorney Booker testified that he'd gotten into the area of bankruptcy law sometime in 2009-2010. He'd started out filing Chapter 128 petitions in state court. He believed he started learning about the area by taking some continuing legal education courses, but wasn't certain.

Attorney Booker testified that he'd begun getting Chapter 128 and bankruptcy clients through word of mouth. Initially he stated that he didn't really advertise much. In response to further questioning, Attorney Booker described the "Light Hero" posters, print advertising in the TV Weekly Reader (commonly called "The Red Book" or "The Blue Book," depending on the location in the Milwaukee metropolitan area), and on the radio (V100.7, a hip hop and R&B station in Milwaukee).

Attorney Booker stated that he had become a lawyer because he wanted to help people. He told the Court that there was a segment of Milwaukee's population that was suffering in the current economic climate, and that many

17

of those residents were in danger of losing power due to the lifting of the disconnection moratorium. He stated that he had tried to create an innovative product that would help these most vulnerable residents keep their power on. He explained that once the Milwaukee County Circuit Court had ruled that the filing of a Chapter 128 petition did not prevent WE Energies from terminating service, the only option left for many of these residents was bankruptcy.

He stated that he had created a product that would give these residents access to the bankruptcy courts while allowing them to represent themselves. He stated that while he was a licensed lawyer, and while he did provide services to his customers in that capacity, he was not their "attorney of record" for the purposes of the bankruptcy, and that he made this fact clear to the clients. He stated that in exchange for the fees he charged, he would meet with the customers to conduct a "suitability analysis," provide the client with a "packet" of materials about bankruptcy, sometimes pull up credit reports, have the customers complete a questionnaire, and then provide the information in the questionnaire to 1st Choice Bankruptcy Preparation Services to be typed.

Attorney Booker said he'd found 1st Choice by surveying petition preparation services on the Internet. He said he was trying to find a service that was reputable and reliable, and that is how he found 1st Choice. He explained that he gave customers a chance to use any preparation service or preparer that they wished. He indicated that there were two other preparation services who'd agreed to work with him, but stated that he couldn't remember

their names.

He emphasized several times that his customers were aware that he would not be acting as their attorney for the purposes of the bankruptcy case. He stated that if the customers wanted additional services above and beyond the "suitability analysis" and the packet of papers, they could contract with him to pay for those additional services. He explained that his representation of the customers was very limited, and involved only pre-petition work. He cited two cases which he claimed held that this kind of limited representation was permissible: In re Griffin, 313 B.R. 757 (Bankr. N.D. Ill. 2004), and In re Colvin, ___ B.R. ___, 2006 WL 2385272 (Bankr. N.D. Ill. 2006).

Attorney Booker told the Court that he'd now had a number of hearings in front of all of the judges in the Eastern District, and that he was aware that his advertising needed to be modified. He argued, however, that the various forms that he required his customers to complete made clear to them the scope of his services, and that the packet of materials that he provided to customers gave them valuable information regarding bankruptcy.

With regard to the particular circumstances of the debtor involved in this case, Attorney Booker stated that when she came to see him, the debtor had informed him that she had a Chapter 13 case open and pending. He stated that he'd done research, and had found a case–In re Whitmore, 225 B.R. 199 (Bankr. Idaho 1998)–which held that a debtor could file a new bankruptcy case while another one was pending. He stated that he'd given the debtor the option

19

to dismiss her 2009 case voluntarily; she had declined. He also stated that he'd informed the debtor that it would be "risky" to file another Chapter 13 while she had one open and pending. When the Court asked Attorney Booker what he meant by "risky"–whether he'd told the debtor that the 2009 case would be dismissed–he stated simply that he'd told her it would be "risky" and that a "motion" might be necessary. When the Court asked whether, in his research, Attorney Booker had found the Seventh Circuit's 2005 decision in Sidebottom, precluding a debtor from having two cases involving the same debts open at once, Attorney Booker stated that he had not found that case.

Attorney Booker was passionate in explaining to the Court that he was trying to help those Milwaukee residents who were at risk due to large light bills. He reiterated that he'd wanted to become a lawyer to help people, and that he strongly believed that he'd created a product in the "suitability analysis" procedure that did just that. He stated that he had earned the fees he charged, and that he now understood that he needed to disclose his fees and modify his advertising.

During the hearing, the attorney who represented the debtor in the 2009 Chapter 13 case informed the Court that WE Energies had turned off the debtor's electricity when the Court had dismissed the 2012 case. Counsel in the 2009 case had attempted to negotiate with WE Energies, explaining that the 2012 case was filed in error, but WE Energies did not accept that explanation, and refused to reinstate the debtor's energy service.

20

At the end of the hearing, the Court ordered Attorney Booker to refund to the debtor the $220 he had charged her in relation to the case, and gave Attorney Booker a deadline of June 15, 2012 by which to file a position paper explaining why the Court should not further sanction him for violations of the Bankruptcy Code.

On May 22, 2012, the debtor's attorney filed a motion asking the Court to dismiss the 2009 case; the Court granted that motion on May 23, 2012. The debtor, through her lawyer, since has filed a new case (so that she can have her electric service reinstated). In the new Chapter 13 case, the debtor filed a motion asking the Court to continue the automatic stay (due to the fact that the Bankruptcy Code states that if a debtor has a case dismissed and then files another one within one year of the first case having been dismissed, the "automatic stay"–the injunction that fends off creditors' collection attempts–applies for only 30 days, unless the debtor proves that the new case was filed in good faith). At the hearing on the motion to continue the stay in the new case, the Court asked the debtor why, if she already had an open Chapter 13 case in which she was represented by an experienced attorney, she had gone to Attorney Booker. She responded that when the state moratorium on winter utility shut-offs had expired on April 16, she'd found herself in danger of having her electricity cut off due to a large arrearage on her bill, and she hadn't wanted to tell her bankruptcy lawyer because she'd been "ashamed" to let him know that she'd incurred so much new debt while still in a Chapter

21

13 bankruptcy.

On June 1, 2012, Attorney Booker filed a pleading entitled "Response to Motion to Show Cause." In this response, Attorney Booker indicated that the debtor had come to his law firm on March 30, 2012 "to obtain legal assistance." He stated that the debtor had gone through "intake" and had signed several documents, including a "Debt Relief Program Agreement," a "Debt Relief Disclosure Form," a "Money Order Authorization Form," a "Debt Relief Packet Acceptance Confirmation," a document entitled "Top 5 Reasons How Your Case Can Be Dismissed," a document entitled "Bankruptcy Explanations & Understandings Addendum," and a debt relief intake checklist.

Attorney Booker's pleading stated that the debtor "was informed"–it doesn't say by whom–that the "law firm" would provide only limited legal services, including a "suitability analysis." He explained that a "suitability analysis" was a "legal consultation, whereby the Attorney reviews pertinent information as well as have a consultation with the client." He stated that he'd provided the debtor with a disclosure of "pre-petition services," and that the debtor had been told that "they [the debtor] would be 'pro se.'" He further stated that he was "not the attorney of record and obtained the debtor's informed consent as well as the proper disclosure that they would not be representing the client."

With regard to this particular debtor's situation–the fact that she had a Chapter 13 case already open and active at the time she visited Attorney

22

Booker's office–Attorney Booker stated that, as part of her "suitability analysis," he had conducted "additional research," and had found a case that would "allow her to file a Chapter 13 under her fact scenario and that is In re Whitmore, 225 B.R. 199 (Bankr D. Idaho 1998) but it would be high risk and would probably require a motion hearing. **It is imperative to note that the debtor had the opportunity to voluntarily dismiss the pending Chapter 13 case**."

Attorney Booker indicated in this pleading that on March 30, 2012, he'd spent 30 minutes meeting with the debtor for "Attorney conference with debtor and intake and completion of forms;" that on April 2, he'd spent thirty minutes for "[r]eview of all info in file including questionnaire, notes, etc.;" that on April 5, 2012, he'd spent two hours to "[r]esearch[] the issue regarding open Chapter 13 case;" and that on April 11, 2012, he'd spent a half hour "[d]raft[ing] letter to client on suitability analysis and service completion." For this 3.5 hours of work, he indicated that he'd charged the debtor $220, or $62.86 per hour. Attorney Booker attached to this pleading several of the documents he'd referenced in it.

At 10:54 p.m. on Sunday, June 10, 2012–almost two months after the debtor filed her petition in the above-captioned case, and over two weeks after the hearing on the Order to Show Cause–Attorney Booker filed (in the Court's after-hours external drop box) a Disclosure of Compensation of Attorney for Pre-Petition Legal Services. It indicated that Attorney Booker had charged the

23

debtor $220 pre-petition, and that she'd paid that full amount prior to the date the petition was filed. Attorney Booker had dated the form May 22, 2012. It indicated (incorrectly) that the debtor had filed a Chapter 7 case. On June 12, 2012, Attorney Booker then filed another Disclosure of Compensation of Attorney for Pre-Petition Legal Services; this form was filed by mail, and received by the Court June 12, and was identical to the first form except that someone had scratched out the "7" next to the chapter under which the debtor had filed, and had written in "13."

On that same date–June 12, 2012–the Court received from Attorney Booker a document entitled, "Correspondence Regarding Further Sanctions." This document stated:

> The purpose of this correspondence is to request that no further sanctions be granted. The voluminous other sanctions on other cases and other courts, as well as the $220 in this case have already proved to be catastrophic for my law firm. I have made several changes to ensure that the major issues illuminated by the court are properly addressed.
>
> First, I have made sure that all marketing materials in the jurisdiction have affixed to them a disclaimer stating "Legacy Legal is a debt relief agency. We help debtor's file bankruptcy under the bankruptcy code," if they did not already have it on them. This was a very tedious task with all of the time constraints involved. Second, I have made sure that there is no collection of any other service fees by any other agency, regardless there is no fee sharing. Next, I have implemented a process whereby I can make sure that all cases have the appropriate Disclosure of Compensation filed within 14 days of when the debtor files. Furthermore, I have filed all of disclosure of attorney compensation with the court for all cases that are currently open.
>
> Also, I have modified the legal service to provide a more

24

robust analysis that includes an evaluation of the disposable income, bankruptcy process, strategic options for bankruptcy implementation as well as bankruptcy filing assistance options, consequences for filing bankruptcy, as well as exemptions analysis. Although I was previously doing the majority of these tasks, I have taken steps to upgrade what I was doing already as well as make sure that I can prove it when I need to. When setting up my process systems initially I attempted to anticipate potential issues and though everything from my forms to my debtor support documentation was sufficient to successfully protect both my law firm and any debtor. My goal was to offer a very reasonable legal service to this community, where people are having more challenges than a lot of other areas around the country.

As it relates to the Diane Jackson case, I have returned my entire legal fee. It should be noted that Mrs. Jackson was also given the legal advice and option to voluntarily dismiss her open Chapter 13, prior to filing a subsequent Chapter 13 as well. I represented to her and all debtors who elect to want to file a Chapter 13 to obtain an attorney if you can when seeking to file a Chapter 13 because it is complicated.

Based on the above, I request that no further sanctions be granted.

Attorney Emory H. Booker III
Legacy Legal Group, LLC
828 N. Broadway Avenue, Suite 120
Milwaukee, WI 53202

Dated May 21, 2012 in Milwaukee, Wisconsin.

II.    The Law Governing Lawyers Who Provide Bankruptcy Services

Section 101(12A) of the Bankruptcy Code defines as a "debt relief agency"

"any person who provides any bankruptcy assistance to an assisted person in

return for the payment of money or other valuable consideration, or is a

bankruptcy petition preparer under section 110 [of Title 11] . . . ." Thus,

bankruptcy lawyers are "debt relief agencies" as defined by the Bankruptcy

25

Code.  *See* <u>Milavetz, Gallop & Milavetz v. United States</u>, 559 U.S. ___, 130 S.Ct. 1324 (2010).

Section 527 of the Bankruptcy Code states that "debt relief agency" which is providing "bankruptcy assistance" to an "assisted person" must provide certain notices to the assisted person.  For example, the debt relief agency must provide the assisted person with the notice required by 11 U.S.C. §342(b)(1)–"a brief description of (A) chapters 7, 11, 12, and 13 and the general purpose, benefits, and costs of proceeding under each of those chapters; and (B) the types of services available from credit counseling agencies."  The debt relief agency must further provide the assisted person with a notice advising the assisted person that the information she provides during the case must be accurate and truthful, that she must disclose all assets and liabilities completely and accurately, that she must disclose the replacement value of each cash asset, that she must disclose current monthly income (in the case of a Chapter 7) or disposable income (in the case of a Chapter 13, and that the information she provides may be audited.

The statute further requires the debt relief agency to provide the assisted person with a "statement" on a separate document.  The statute actually provides lawyers with a sample statement:

IMPORTANT INFORMATION ABOUT BANKRUPTCY ASSISTANCE SERVICES FROM AN ATTORNEY OR BANKRUPTCY PETITION PREPARER

If you decide to seek bankruptcy relief, you can represent yourself,

26

you can hire an attorney to represent you, or you can get help in some localities from a bankruptcy petition preparer who is not an attorney. THE LAW REQUIRES AN ATTORNEY OR BANKRUPTCY PETITION PREPARER TO GIVE YOU A WRITTEN CONTRACT SPECIFYING WHAT THE ATTORNEY OR BANKRUPTCY PETITION PREPARER WILL DO FOR YOU AND HOW MUCH IT WILL COST. As to see the contract before you hire anyone.

The following information helps you understand what must be done in a routine bankruptcy case to help you evaluate how much service you need. Although bankruptcy can be complex, many cases are routine.

Before filing a bankruptcy case, either you or your attorney should analyze your eligibility for different forms of debt relief available under the Bankruptcy Code and which form of relief is most likely to be beneficial for you. Be sure you understand the relief you can obtain and its limitations. To file a bankruptcy case, documents called a Petition, Schedules, and Statement of Financial Affairs, and in some cases a Statement of Intention, need to be prepared correctly and filed with the bankruptcy court. You will have to pay a filing fee to the bankrupt court. Once your case starts, you will have to attend the required first meeting of creditors where you may be questioned by a court officer called a 'trustee' and by creditors.

If you choose to file a chapter 7 case, you may be asked by a creditor to reaffirm a debt. You may want help in deciding whether to do so. A creditor is not permitted to coerce you into reaffirming your debts.

If you choose to file a chapter 13 case in which you repay your creditors what you can afford over 3 to 5 years, you may also want help with preparing your chapter 13 plan and with the confirmation hearing on your plan which will be before a bankruptcy judge.

If you select another type of relief under the Bankruptcy Code other than chapter 7 or chapter 13, you will want to find out what should be done from someone familiar with that type of relief.

Your bankruptcy case may also involve litigation. You are generally permitted to represent yourself in litigation in bankruptcy

27

Case 12-25456-pp    Doc 27    Filed 06/20/12    Page 27 of 74

court, but only attorneys, not bankruptcy petition preparers, can give you legal advice.

The statute further requires the debt relief agency, "to the extent permitted by nonbankruptcy law," to help the assisted person to learn how to value assets at replacement value, determine current month income or disposable income, how to complete the list of creditors, and how to determine what property is exempt and to value exempt property.

Section 528 of the Code requires debt relief agencies to execute a written contract with the assisted person, clearly explaining the services the agency will provide and the fees, charges and terms of payment. It further requires the agency to "clearly and conspicuously disclose in any advertisement of bankruptcy assistance services or the benefits of bankruptcy directed to the general public (whether in general media, seminars or specific mailings, telephonic or electronic messages, or others) that the services or benefits are with respect to bankruptcy relief under this title," 11 U.S.C. §528(a)(3), and to follow that disclosure with the words, "We are a debt relief agency. We help people file for bankruptcy relief under the Bankruptcy Code," or words to that effect, 11 U.S.C. §528(a)(4).

Section 526 of the Code provides for sanctions, including disgorgement of fees, actual damages, and reasonable attorneys' fees and costs, for intentional or negligent failure to comply with the requirements of §§527 and 528. It also allows a court to impose civil penalties if the debt relief agency "engaged in a

28

clear and consistent pattern or practice of violating" the section.

Section 329 of the Code governs attorneys representing debtors in bankruptcy cases. It states that an

> attorney representing a debtor in a case under this title, *or in connection with such a case*, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

11 U.S.C. §329(a). That section further provides that if the compensation the attorney charges "exceeds the reasonable value" of the services provided, the court may cancel the agreement, or order the attorney to return the payment.

Section 504 of the Bankruptcy Code prohibits an attorney from splitting fees. It states that the attorney "may not share or agree to share (1) any such compensation or reimbursement with another person; or (2) any compensation or reimbursement received by another person [under preceding sections of the Code]."

Section 105(a) of the Bankruptcy Code authorizes a bankruptcy court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."

Fed. R. Bankr. P. 9011(a) states, "**SIGNATURE**. Every petition, pleading, written motion, and other paper, except a list, schedule, or statement, or amendments thereto, shall be signed by at least one attorney of record in the

29

attorney's individual name."

Local Rule 9010 of the Bankruptcy Court for the Eastern District of Wisconsin provides, "**Withdrawal and Substitution of Attorneys of Record.** An Attorney who has appeared as the attorney of record for the debtor, trustee creditors' committee, or party in a case, adversary proceeding, or contested matter may not withdraw, be relieved or displaced except by notice to the party represented and any adversaries and by leave of the court."

Local Rule 9010.1 of the Bankruptcy Court for the Eastern District of Wisconsin provides,

> **Disclosure of Attorney Who Drafts Petition, Pleading, Proposed Order, Trial-Related Document, Schedule, or Statement of Affairs; Prohibition Against Ghostwriting.** An attorney, whether or not the attorney of record, who makes a major substantive contribution to a petition, pleading, proposed order, trial-related document, schedule, or statement of affairs which is filed with the court or is intended to be filed with the court shall disclose the name, address, phone number, facsimile number and e-mail address of the attorney in the lower left corner of the first page.

III.  Ethical Rules

The rules governing the ethical conduct of lawyers are contained in Chapter 20 of the Rules of the Supreme Court of Wisconsin, "Rules of Professional Conduct for Attorneys." The Wisconsin Supreme Court promulgates these rules, and enforces them. SCR 20:1.1 states that a lawyer must provide "competent representation" to a client, defined as "the legal knowledge, skill, thoroughness and preparation necessary for that representation."

30

SCR 20:1.2(c) states, "A lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances and the client gives informed consent."

IV. <u>Legal Discussion</u>

The question before the Court is whether the Court should impose sanctions on Attorney Booker in addition to the order it already has entered requiring him to refund to the above-captioned debtor the $220 fee she paid him. The Court concludes that it must impose additional sanctions.

    A.    *The practice of "unbundling" legal fees*

It is not uncommon in certain areas of legal practice for lawyers to provide "unbundled" legal services, also referred to as "limited scope representation." A lawyer who provides unbundled services does not represent the client from "cradle to grave," as it were. Rather, the lawyer provides only certain specified services. The scope of those services varies, depending on the ethical rules and court rules of the particular jurisdiction, and the attorney's creativity.

A form of "unbundling" has existed in bankruptcy courts for some time. It is common for a bankruptcy lawyer to agree to represent a client in the "underlying" bankruptcy case, but to make clear in her retainer agreement that she will not represent the client in any lawsuits which may arise within that bankruptcy case (these lawsuits are called "adversary proceedings," and occur when the debtor sues someone, or someone sues the debtor, in connection with

31

the underlying bankruptcy). It is also somewhat common in Chapter 7 cases for lawyers to limit the scope of their representation to pre-filing counseling and consulting, document preparation and filing, and attendance with the debtor at the meeting of creditors. Of course, many bankruptcy lawyers represent their clients with regard to any issue that might arise from the time the client walks into the door until the bankruptcy case is complete.

Whether a lawyer may provide limited scope representation in a bankruptcy case, and to what extent, depends on two bodies of rules. First, it depends on the ethical rules of the particular jurisdiction in which the lawyer practices. Some states do not allow attorneys to provide limited scope representation; others allow it only under certain conditions. Most jurisdictions do require attorneys to clearly outline in their written retainer agreements what activities they will and won't provide for the fees being charged.

Second, it depends on the rules of the particular bankruptcy court in which the attorney is practicing. Most bankruptcy courts have "local" rules dealing with issues not addressed by the Federal Rules of Bankruptcy Procedure. Some courts have rules that directly address limited scope representation. Others have something called a "presumptively reasonable" fee. If the attorney's fees will not exceed the presumptively reasonable amount, the court does not require the attorney to file an itemized request for payment of fees. Many courts have a list of duties which an attorney must agree to

32

perform in order to be allowed to take advantage of the convenience of the "presumptively reasonable" fee. Other courts don't have such a list, but require the attorney to file a motion to withdraw from representing the client if the attorney's fee agreement doesn't cover certain activities.

At the May 22 hearing, Attorney Booker cited two cases which, he argued, stood for the proposition that his particular version of "unbundling" was allowed by bankruptcy courts. Neither case supports his version of unbundling, and neither case was from Wisconsin (and thus did not involve Wisconsin's ethics rules or this district's local rules).

First, he cited In re Griffin, 313 B.R. 757 (Bankr. N.D. Ill. 2004). In that case, the debtors' attorneys filed a "supplement" to their initial fee disclosure, to be paid out of the loan the debtors obtained to redeem their car. The court held that §330 of the Bankruptcy Code did not authorize the attorneys to be paid out of estate funds, that the automatic stay (and eventual discharge injunction) prevented the attorneys from trying to collect the funds from the debtors, and that the attorneys' failure to disclose the fees violated § 329 of the Code. Accordingly, the court ordered the attorneys to disgorge the fees. The Griffin case did not involve unbundling–it involved whether the supplemental fee disclosure violated § 329 and whether there was any authority to pay the fees listed in that disclosure.

The second case Attorney Booker cited was In re Colvin, ___ B.R. ___, 2006 WL 23857272 (Bankr. N.D. Ill. 2006). In this case, the debtors signed a

33

*post-petition* retainer agreement with their attorney, agreeing to pay the lawyer an additional sum to prepare a motion to redeem their car. Because of the post-petition fee agreement, the fact that estate funds were not used to pay the fees, and the fact that the Court found the fees reasonable for the work the attorney did, the Colvin court did not require disgorgement of fees. Again, this decision does not support Attorney Booker's practice–he obtains his fees pre-petition.

The Court, however, conducted a brief search for bankruptcy cases involving unbundled services, and found too many of them to recount here. The fact that Attorney Booker went to the trouble to try to find some cases to support his unbundling practice, yet failed to find the plethora of cases extant on the topic, supports the Court's concerns about the quality of Attorney Booker's work. And the cases the Court found, when viewed together, serve as a strong cautionary tale about the perils an attorney undertakes when he attempts to be "creative" in crafting an unbundled services program.

In In re Merriam, 250 B.R. 724 (Bankr. D. Colorado 2000), the U.S. Trustee filed a motion asking the court to examine the fees charged by the debtor's attorney. In Merriam, the attorney assisted the debtor in preparing the petition, but did not sign it. Id. at 728. The Merriam court called this practice "ghostwriting." Id. The Merriam court went through a thorough discussion of why § 329 requires attorneys to disclose their compensation, then noted that courts generally won't reduce an attorney's fees if the attorney's

Case 12-25456-pp    Doc 27    Filed 06/20/12    Page 34 of 74

service did not breach a duty that caused harm to the client.  Id. at 732.  The court concluded, however, that the attorney had an obligation to sign the petition, relying mainly on Fed. R. Bankr. P. 9011 (which states that every petition "shall be signed by at least one attorney of record in the attorney's individual name.").  Id. at 735-736.  The court then proceeded to analyze whether to require the "ghostwriting" attorney to disgorge his fees, utilizing that court's administrative order relating to limited scope representation, as well as the Colorado Rules of Professional Conduct.  Id. at 736-738.

The Merriam case illustrates the fact that if an attorney assists a debtor in preparing the petition, that attorney must sign the petition pursuant to Fed. R. Bankr. P. 9011.  It further illustrates the fact that an attorney's unbundling of services must comply with the state's rules of professional conduct and with the court's rules.

In In re Johnson, 291 B.R. 462 (Bankr. D. Minnesota 2003), the debtors' attorney offered his clients the option of paying a reduced fee by agreeing that they'd attend the meeting of creditors alone, without counsel.  Id. at 464.  The attorney produced documentation in support of his argument that the clients understood that this was what they had agreed to.  Id. at 465.  The Minnesota court's local rule, however, prohibited this practice–it required the attorney to remain on the case until such time as he filed a motion to withdraw and the court granted that motion.  Id. at 467-469.  Pertinent to this Court's consideration of Attorney Booker's practice, the Johnson court stated:

35

> . . . More problematic, as the court explained in [In re] *Castorena* [270 B.R. 504 (Bankr. D. Idaho 2001)], is the condition of the debtor who enjoyed the benefit of some counsel but must proceed through other parts of the bankruptcy case unaided. "To send a debtor into a bankruptcy pro se, on the theory that he has had 'enough' advice and counseling in the document preparation state to safely represent himself, is except in the extraordinary case so fundamentally unfair as to amount to misrepresentation. *Castorena*, 270 B.R. at 529. "[I]t requires a leap to believe that" no problems will arise and no further counsel be helpful or required post-petition. *Id.* at 530.

Id. at 470. This Court could not have articulated better one of the major problems inherent in Attorney Booker's form of unbundling–and it is not clear to this Court that Attorney Booker provides the level of pre-petition "advice and counseling" that was provided by the debtors' attorney in Johnson.

In another Minnesota case, In re Bulen, 375 B.R. 858 (Bankr. D. Minnesota 2007), the debtors' attorney filed fee disclosure statements that reflected "amounts substantially less than actually paid by the debtors for bankruptcy related legal services." Id. at 861. The court found that the attorney's retainer agreement, which provided that she could withdraw any time for any reason and that she did not have to attend the meeting of creditors, violated the court's local rule. Id. at 863-866. The court opined that "[t]his unbundled situation is certainly not beneficial to the debtor. Neither does it provide any degree of efficiency or expediency to the Court. In bankruptcy, unbundled legal services essentially means unraveled legal process, not increased access to justice." Id. at 866. Again, the Bulen court articulated this Court's concerns with Attorney Booker's method of

36

unbundling.

In addition, the <u>Bulen</u> court looked at Minnesota's rules of professional conduct, which tracked Wisconsin's–an attorney could unbundle services "only to the extent that the limitation is reasonable and only with the informed consent of the client." <u>Id.</u> The court noted that its own local rule–the one providing that the attorney must stay in the case until he or she withdraws–went further, and "in effect provides that unbundling main case representation is patently not reasonable, except under circumstances determined by the Court after a hearing on a motion to withdraw, in the absence of a filed substitution of attorney." <u>Id.</u> The Court shares the <u>Bulen</u> court's view.

In <u>Hale v. U.S. Trustee</u>, 509 F.3d 1139 (9th Cir. 2007), the attorney provided "pre-filing legal services" to the debtors, wherein he agreed to "analyze" their financial situation and prepare their petition and "exhibits," but not to attend the meeting of creditors. The attorney did not sign the petition, but the petition listed the fee the debtors had paid the attorney. <u>Id.</u> at 1141. After protracted litigation (during which the attorney accused the bankruptcy court of harassing him and of being biased), the bankruptcy court imposed sanctions, both monetary (disgorgement of the $250 fee and a fine of $2,000) and non-monetary (barring the attorney from preparing petitions unless he signed them and barring him from assisting clients unless he agreed to appear at the meetings of creditors). <u>Id.</u> at 1144-45. The Ninth Circuit court of

37

appeals held that the bankruptcy court did not abuse its discretion in requiring the attorney to disgorge his fees (citing §329) or in sanctioning him.  Id. at 1148.  The court stated:

> In an effort to avoid liability, [the debtors' attorney] did not sign Debtors' bankruptcy petition.  He had an extensive history–and an ongoing practice–of similar violations.  Despite assertions to the contrary, he failed to obtain informed consent to his limited representation.  He failed to inform his clients about the meeting of creditors requires under 11 U.S.C. §341 and to highlight the fact that he did not intend to represent them at the meeting.  He attempted to persuade his clients to dismiss their bankruptcy petition without explaining why or what prejudice they might suffer if they did so.  When the bankruptcy court inquired into his representation, he failed to attend hearings, giving little or no advance notice of his absence, and accused the court, on the basis of unaccredited hearsay, of bias and impropriety.

> We agree with the bankruptcy court that it should "not countenance [the attorney's] exclusion of critical and necessary services, or endorse the pretense of adequately advised and informed consent in [the attorney's] bankruptcy cases."  Although the court effectively barred [the attorney] from assisting pro se debtor in a limited manner that allows the debtors to remain pro se, the court ordered those sanctions in response to specific and repeated acts of incompetent and irresponsible representation.  Under the specific facts of this case, we cannot say that the bankruptcy court abused its inherent power to impose sanctions.

Id. at 1148-49.

Attorney Booker is not guilty of some of the infractions the Ninth Circuit recounts.  He appears to inform the debtors who pay him of the meeting of creditors (although a number of them do not comprehend that he will not be appearing with them at that meeting).  Attorney Booker has, to his credit, appeared at the majority of the show-cause hearings the judges have

38

scheduled–and there have been a number of them.  But he, like the attorney in Hale, has excluded "critical and necessary services," has engaged in repeated "acts of incompetent and irresponsible representation," and, as the Court will discuss, has implicitly asked the Court to "endorse the pretense of adequately advised and informed consent."  (To see in more detail the nature of the Idaho bankruptcy court's concerns with regarding this lawyer, see In re Brown, 408 B.R. 509 (Bankr. D. Idaho 2009)).

Finally, in In re Wood, 408 B.R. 841 (Bankr. D. Kansas 2009), the debtor went to a company purporting to provide debt consolidation services.  That company referred her to a company that proposed to enroll her in a "debt resolution plan," to be administered by a law firm.  Id. at 844.  An attorney contacted the debtor, after which she signed a contract enrolling in the debt resolution program.  Id. at 844-845.  At the end of a long and winding road, the Kansas bankruptcy court found that the attorney's fee disclosures were inaccurate, that the fees were excessive and unreasonable, and that some of the attorneys involved were not licensed in Kansas.  In particular, the Kansas court noted,

> . . . What did these attorneys' fees buy for [the debtor]?  Not much.
> Assuming she signed a retainer agreement like the specimen
> [provided in court], [the debt resolution company's] scope of
> representation is severely limited.  The fees encompass preparation
> and filing of the petition, schedules, statement of financial affairs
> and any other required documents to file for chapter 7 bankruptcy,
> communication with creditors, and attendance at the § 341
> meeting of creditors.  The retainer does not include numerous
> post-petition services and does not contemplate court or hearing

39

appearances (other than the § 341 meeting). The attorney's fees do not include representation of the debtor in nondischargeabiltiy complaints, adversary proceedings, 'voiding of liens,' motions to lift the automatic stay, Rule 2004 examinations, reaffirmations, re-scheduled § 341 meetings, or audits of the bankruptcy case under 28 U.S.C. § 586(f). Based upon the scant record before the Court, the services provided by [the lawyers] are similar in many respects to those of a bankruptcy petition preparer. No evidence was presented of communications or negotiations by [the lawyers] with [the debtor's] creditors after the filing of her petition. [The lawyers] did not appear with the debtor for her § 341 meeting.

Id. at 850.

Attorney Booker has, as did the Wood attorneys, allied himself with a non-lawyer (1st Choice Bankruptcy Preparation) to set up a system for providing extremely limited scope services. Indeed, Attorney Booker does not even prepare the bankruptcy papers himself, nor does he agree to attend the § 341 meeting. It appears that all Attorney Booker does is (a) provide the debtors with a packet of papers, including a questionnaire they are to complete, (b) pull their credit reports, (c) give them access to the pre-petition credit counseling, and (d) funnel their questionnaire to a petition preparer. The above cases demonstrate that Attorney Booker is on dangerous ground using this unbundling system. Wisconsin's ethics rules, and this Court's local rules, cement that conclusion.

Wisconsin's rules of professional conduct for lawyers allow lawyers to limit the scope of their representation, as long as the limitation is "reasonable," and the client gives "informed consent." At the May 22 hearing and in his post-hearing pleadings, Attorney Booker argued that he makes clear to the people

40

who come to him the limited scope of his representation, and that they provide informed consent to that limited scope.

It is up to the Wisconsin Supreme Court, not this one, to determine whether Attorney Booker's actions constitute violations of the Rules of Professional Conduct. But this Court concludes that the scope of the representation Attorney Booker provides is not reasonable, and that many of the people who hire him do not provide "informed" consent.

As to the reasonableness of the limited scope of Attorney Booker's representation, the Court must state candidly that it still does not have a good grasp on what it is that Attorney Booker does in exchange for the money he charges. He provides a "packet" of information. A good amount of the material, as far as the Court can tell, is material designed to tell potential customers (as he calls them) that he is not doing things for them, without much specificity in that regard. He also provides some documents which, it appears, he obtained from this Court's web site–the "Frequently Asked Questions" page, the "Do I Need an Attorney?" page, the information on the Court's Help Desk service. Debtors can obtain *all* of these pages *free of charge* by logging on to the Court's web site or visiting the clerk's office or the Court's Help Desk.

Other information that he provides in the packet is, quite simply, wrong. The Court will discuss the information provided when it gets to the discussion of informed consent.

41

Attorney Booker also argues that he provides information orally to debtors.  It is difficult to determine which debtors do and don't receive "advice," because he talks to some of them one-on-one, to others in groups.  Still others he does not meet with at all.  The number of debtors who appear before the judges surprised that they have no stay in place, or that they are not eligible for a discharge, or that their schedules were not complete, constitutes strong circumstantial evidence that whatever Attorney Booker is telling debtors, it isn't sufficient to educate them about the things they need to know in order to navigate the bankruptcy system.  As the <u>Johnson</u> court stated, Attorney Booker's pre-petition communications with the debtors do not prepare them with "enough" counseling or advice–possibly any counseling or advice.

Attorney Booker pulls credit reports for some debtors.  Certainly this is useful, but hardly something that the debtors need to pay Attorney Booker for.

The most significant "service" that Attorney Booker provides, to which many of his documents refer, is that he conducts a "suitability analysis" to determine whether each debtor is a candidate for bankruptcy, and which chapter would suit that candidate.  Whatever it is that he is doing by way of a "suitability" analysis, it isn't determining the debtors' suitability for bankruptcy.  For example, the debtor in this case wasn't "suitable" for a new Chapter 13, because she had one already open and pending.

Attorney Booker indicated both at the May 22 hearing and in his post-hearing pleadings that he conducted "research," and found a case that

42

indicated that a debtor could have two cases open at the same time. The case Attorney Booker cited was In re Whitmore, 225 B.R. 199 (Bankr. D. Idaho 1998). After the hearing, the Court read the Whitmore case. First, while the Court has great respect for its sister bankruptcy court in Idaho, the decisions of one bankruptcy court are not binding on another bankruptcy court. The sister court's reasoning may be persuasive, but the decision has no binding effect on another bankruptcy court. The decisions that *are* binding on the above-signed bankruptcy court are those issued by any district court which may hear this Court's cases on appeal, those issued by the Court of Appeals for the Seventh Circuit (which hears all appeals from federal courts in Indiana, Illinois and Wisconsin), and those issued by the United States Supreme Court. Not only was the Whitmore case a bankruptcy decision not binding on this Court, but it was issued by a court located in the Ninth Circuit–not the Seventh. Further, the Whitmore decision was issued on September 10, 1998–prior to the implementation of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, the law which governed bankruptcy at the time this debtor filed her petition.

Attorney Booker cited this decision at the May 22 hearing in spite of these facts. That, in and of itself, would not be of great concern if there were no governing case law in the Seventh Circuit, and if the Whitmore decision actually did provide authority for a debtor to have two cases open at once. Neither is the case.

The Seventh Circuit does have a decision on the issue--In re Sidebottom, 430 F.3d 893 (7th Cir. 1005), decided December 9, 2005.  In Sidebottom, the Seventh Circuit stated that a debtor "generally" may not have two cases open at the same time.  That decision is binding on this Court, and on all other bankruptcy courts in Indiana, Illinois and Wisconsin.  Yet Attorney Booker's two hours of research did not unearth this decision, or if it did, he chose not to cite it.  In their first year of law school, lawyers take legal research classes, where they learn that they should cite binding authority first, then persuasive authority.  The Court, giving Attorney Booker the benefit of the doubt, assumes that he did not find the Sidebottom case somehow, and not that he did find it, realized that it would prohibit him from collecting a fee from the debtor, and deliberately failed to cite it.

Even if the Seventh Circuit had not spoken on the issue in Sidebottom, the Whitmore case does not support Attorney Booker's conclusion that debtors are permitted to have two cases pending at once.  The Whitmore debtors had filed a Chapter 13 bankruptcy petition on June 9, 1997.  In re Whitmore, 225 B.R. 199, 200 (Bankr. D. Idaho 1998).  On May 14, 1998, the Chapter 13 trustee filed a motion asking the court to dismiss the case, because the debtors had not been making their plan payments.  Id. The motion stated that the court could dismiss the case with further notice or hearing if the debtors did not cure the default in plan payments within 20 days–that is, by June 3, 1998.  Id.

44

Rather than curing the default, on June 11, 1998–after the deadline for curing the default, but before the court had signed the order dismissing the case–the debtors filed a motion to voluntarily dismiss their case pursuant to §1307(b) of the Bankruptcy Code.  As it happens, on this same day–June 11, 1998–the trustee got around to filing with the court a certification indicating that the debtors hadn't cured the default, and asking the court to sign the order of dismissal.  Id.

On June 12, 1998–without waiting for the bankruptcy court either to dismiss the case on the trustee's motion or dismiss it on their own motion–the debtors filed a second Chapter 13 case.  Id.  The earlier case had not yet been dismissed, because when the debtors had filed the motion to voluntarily dismiss, the clerk's office erroneously had sent the trustee a notice giving the trustee ten days to object.  Id.

On June 18, 1998–six days after the debtors filed their voluntary motion to dismiss–the bankruptcy court signed the order granting the trustee's motion to dismiss for failure to make plan payments and failure to cure the default.  Id. at 200-201.  So, for six (6) days, the debtors had two Chapter 13 cases open at the same time.  Seizing on this situation, a creditor filed a motion to dismiss the second case, because it was pending "simultaneously" with the first case.  Id. at 201.  The bankruptcy court denied that motion, on the grounds that the debtors' first case should have been dismissed immediately upon their filing of a motion to voluntarily dismiss (in other words, on June 11).  Id. at 202.  The

45

court concluded,

> Here, viewing the two filings together, the net result is that for six days both chapter 13 cases were pending; after that time, the first case was dismissed and only the second remained. Property of the estate was and is now being administered solely in the second case. Under all the circumstances, including the Whitmore's reasonable reliance on the efficacy of their § 1307(b) motion, the fact that the two cases here were simultaneously pending for a few days does not warrant dismissing the second case.

<u>Id.</u>

That Attorney Booker would rely on the <u>Whitmore</u> decision to advise the debtor in the current case that she could file a new Chapter 13 petition while a previous one was pending is mind-boggling. The entire premise of the <u>Whitmore</u> decision was not that debtors could have two cases open at once, but that had the court done what the law required it to do and dismissed the debtors' first case when they'd filed a motion to voluntarily dismiss, the two cases would not have been open simultaneously to begin with.

In contrast, this debtor filed her first Chapter 13 case on April 17, 2009. She'd been paying into her Chapter 13 plan for three years by the time she visited Attorney Booker. She was in a three-year plan that proposed to pay $5,850 to her creditors–it appears that she may have been on the brink of finishing off that plan and receiving a discharge. Her attorney and the trustee had successfully objected to a couple of claims, she'd gotten her plan confirmed, she'd survived a motion to dismiss for failure to make her plan payments. Her case, however, was not complete, and it is not clear when it

46

would have been complete, given that a number of things still needed to happen–she needed to complete the plan payments, she needed to file her financial management course certificate, the trustee needed to file a notice of completion, she needed to file DSO and § 522(q) certifications.  It is conceivable that the 2009 case could have proceeded for several months (36 months from confirmation would have been somewhere around July 20, 2012).

Attorney Booker argued that he told the debtor that it would be "risky" to file a Chapter 13 while her old case was pending.  He argued that he "gave her the option" to dismiss the 2009 case.  He argued that he told her that she might have to "file a motion."  He has not argued, however, that he said to the debtor, "You can't, under the Seventh Circuit's decision in Sidebottom, file a new case while your old case is pending.  You either need to dismiss your old case–which you have an absolute right to do–or go back to your prior attorney and discuss your concerns with him."  He has not argued that there is some legal authority in the Seventh Circuit or anywhere else that would allow two different Chapter 13 trustees to administer two different cases for the same debtor at the same time.  He has not argued that he had some inside knowledge of when the debtor's 2009 case would be dismissed.  And he has not addressed the fact that, as a result of his "advice" to her that she was "suitable" for filing a new Chapter 13 bankruptcy case, the debtor had her lights turned off.  Whatever Attorney Booker did for this debtor, it did not consist of "analyzing" her "suitability" for Chapter 13 relief.

47

Similarly, debtors who aren't eligible for a discharge aren't "suitable" for another Chapter 7 case. Debtors who have no source of income, but who file a Chapter 13 because they are not eligible for a Chapter 7 discharge are not "suitable" to file Chapter 13. The judges have seen both types of debtors come through the courts after getting a "suitability analysis" from Attorney Booker.

Nor is it clear that a debtor whose major debt is WE Energies debt, and who will not be able to afford her electric bills after discharge anymore than she could afford them before, is "suitable" for bankruptcy relief. For example, debtor Joe Hairston, docket no. 12-25375, went to Attorney Booker for a "suitability" analysis. Mr. Hairston's schedules show that he owed WE Energies approximately $4,600, as well as owing some medical debt. His income? $756 per month, $200 of which came in the form of food stamps. If Mr. Hairston makes it to discharge in his case, he will have discharged the $4,600 to WE Energies that he accrued prior to April 18, 2012–the day he filed his petition. But already, his utility bills for May and June have accrued. By the time he receives a discharge in August, more will have accrued. Perhaps he will be able to pay some of those, perhaps not. Come November, the moratorium will go into effect, and Mr. Hairston may not pay his bills from November 2012 to April 2013. If that happens, he will find himself in April of 2013 facing the threat of termination of his electrical service. He can file a Chapter 128, but that will not stop the disconnection, per Judge Pocan's order. And while he can file a Chapter 7 petition, *he will not be eligible for a discharge*,

48

because the Bankruptcy Code provides that a debtor must wait eight years before obtaining a second discharge.

Was Mr. Hairston "suitable" for Chapter 7 bankruptcy? Certainly he needed help. Certainly he is one of those most vulnerable among us, one of those who somehow has fallen through societal cracks into an area where it is impossible for most of us to imagine being able to make ends meet. But was bankruptcy the answer to his problems? More to the point–was it reasonable for Attorney Booker to take $225 from Mr. Hairston, plus $75 for 1st Choice Bankruptcy Preparation, plus whatever Mr. Hairston had to pay to take the credit counseling and the personal financial management course, in exchange for giving him a packet of papers he could've gotten for free, telling him he was "suitable," and sending his papers to a typist? In this Court's view, it was not.

In sum, Attorney Booker's limited scope of representation is not reasonable. Further, the evidence contradicts his assertion that most of his clients provide "informed consent." A look at the documents he filed with his post-May 22 pleadings demonstrates this fact.

<u>The Debt Relief Program Agreement</u>

The "Debt Relief Program Agreement" is a one-page document that contains eleven numbered paragraphs. Some of these have lines next to them on which a debtor is place her initials. Paragraph one of the agreement states that the debtor is agreeing to purchase a "debt relief packet" and to employ "Attorney only for the analysis of the debtor's financial information to ascertain

49

if they are suitable for a Chapter 7, State Chapter 128, or Chapter 13 Bankruptcy in the following jurisdictions: State of Wisconsin and/or U.S. Eastern District." Paragraph two states that the debtor understands that she'll have to have all of her bankruptcy documents prepared by "someone else," that the debtor herself will have to file the documents with the "Clerk of the Bankruptcy Court, if applicable," and that the debtor must pay the filing fee and the credit counseling fee "if applicable, when they decide to file their respective documents."

Paragraph three says that the debtor is giving the "Attorney" the authority to "out source the professional bankruptcy form preparation, if applicable, (i.e. schedules, petition, forms, etc.) to an independent contractor who will have the sole authority to do the complete bankruptcy document preparation." The paragraph asks the debtor to "[p]lease note that Attorney is only doing suitability analysis prior to the filing." It also states that the debtor understands that she can choose "any document preparer that they want," and can send the information directly to the document preparer if she so chooses.

Paragraph four states,

This agreement does not include additional consultation time to assist with documents filings, court appearances or any other issues not addressed in this agreement. Additional issues need to be addressed via a new contract including but not limited to any potential future consultations, form preparations, form modifications, post filing issues, and/or form filings.

Paragraph five states that the debtor understands "that this is a <u>pro se</u>

<u>set up</u> and client is giving their <u>informed consent</u> and understands that all legal services are pay per service and this current service does not include any additional legal services not listed in Paragraph 1 (i.e. all services are 'a la carte.')" This paragraph has a line next to it, where the debtor is to insert her initials. The debtor did initial this provision.

Paragraph six informs the debtor that the document preparer relies on the information the debtor provides, and that all the information the debtor provides must be accurate. Paragraph seven tells the debtor that she is responsible for paying the filing fee "of **$35 for a Chapter 128, $299 for Chapter 7, or $274 for a Chapter 13**."

Paragraph eight states that the attorney is agreeing to accept employment, and agrees to provide the services required "of *him*" (emphasis in the original) on the terms stated in the agreement.

In paragraph nine, the agreement specifies that the fee "for the legal analysis to confirm the suitability of the Debtor's circumstance for debt relief" is the debtor's responsibility. The *typed* portion then states that the fee "shall include but not limited to an hourly fee of $325 per hour at a minimum of a $325.00 or _____ deposit and $____ due in _____ days." Someone has, however, marked an "X" through the second "$325.00," inserted "220.00" in the line before "deposit," and drawn horizontal lines through the blanks next to "$" and "days." The paragraph goes on to state that the debtor has to make a "deposit" of $75.00 in the form of a money order to be provided to the professional

51

document preparer." The typed portion of the penultimate sentence reads, "The total deposit is $400.00 or $_____." Again, someone has made an "X" in pen through "$400.00," and has written "295.00" in the blank next to the dollar sign. The last sentence states, "Debtor may also be responsible for a credit report fee ($35) and/or credit-counseling fee ($35), if requested." Someone has circled the "$35" next to "credit-counseling fee." The initials "E.B." appear to the side of this paragraph in pen, and a hand-written notation which, while hard to decipher, appears to say, "Also paid $25 for 1st Court."

Paragraph ten states that the debtor "may cancel this agreement within three business days in writing and attorney is entitled to any and all work provide at the attorneys hourly fee of $325/hour." Paragraph eleven concludes by stating that the debtor acknowledges having read the agreement and consents to its terms, and there are spaces for Attorney Booker and the debtor to sign and date the agreement.

Most of this document appears designed to tell the debtor what the debtor has to do, and what Attorney Booker is NOT going to do. But if Attorney Booker does not take the time to explain to debtors the sorts of issues that arise in even the most mine-run bankruptcy cases, telling the debtor that he "isn't going to do anything else" does not help them. In several of the cases the Court outlined above, the attorneys who had limited their representation at least specified the services they wouldn't be providing–lien avoidance motions, nondischargeability actions, responses to motions for relief from stay,

52

objections to confirmation of plans, etc.  Attorney Booker's documents and agreements do not so specify (except to tell the debtors that he won't appear at the meeting of creditors).  A debtor cannot provide "informed" consent to accepting extremely limited representation if the debtor doesn't know the panoply of options that have been excluded.

The document also contains incorrect information.  The Chapter 7 filing fee is $306, not $299.  The Chapter 13 filing fee is $281, not $274.   The document states that the debtor may cancel the agreement within three business days in writing, but gives no explanation of what will happen to the debtor if this occurs.  The document says that "attorney is entitled to any and all work provided"–does this mean that if the debtor cancels, the debtor does not get copies of any of her paperwork?

The information regarding the fee is confusing.  The agreement indicates that the attorney's billing rate is $325/hour, but indicates that this debtor will pay $220.  In the papers he filed with the Court after the May 22 hearing, Attorney Booker indicated that he'd done 3.5 hours of work for the above debtor–$1,137.50, if one applies the stated hourly rate.  Yet he charged the debtor only $220.  It is not clear what a debtor is supposed to make of this conflicting language–if the lawyer intends to charge a flat rate of $220 for the case, the agreement should say as much.

### 11 U.S.C. §527(a)(2) Disclosure

The second document Attorney Booker provided is captioned, "11 U.S.C.

53

'527(a)(2) DISCLOSURE." The disclosure informs the debtor that a "debt relief agency" must provide information to "assisted persons" filing bankruptcy. It tells the reader that the reader is "an assisted person filing bankruptcy." The document goes on to tell the reader that the reader is required to provide complete, accurate and truthful information, disclose all assets and liabilities, and state all current monthly income or disposable income. It also warns the reader that the information the reader files may be audited, and that there are penalties–including dismissal of the case or imposition of sanctions–for failing to provide the information described. It is not clear whether this is the "Debt Relief Disclosure Form" Attorney Booker referenced in his pleading–he did not attach any form which contained that caption.

This form complies with the requirements of *part* of §527(a)(2) of the Code. Accordingly, it appears that Attorney Booker is providing customers with at least one of the disclosures the law requires.

<u>Top Five Reasons How Your Case Can Be Dismissed</u>

The next document he filed is captioned, "Top Five Reasons How Your Case Can Be Dismissed." The first reason listed is, "You don't do the **credit counseling** or you don't do it when you are supposed to (i.e. prior to filing and 30 days after you file)." The second is failure to pay the filing fee, or failure to pay the installments on the filing fee. This paragraph lists–again, incorrectly– the Chapter 7 filing fee as $299 and the Chapter 13 fee as $274. It also lists the installment fee payments as "$100, $100 and $99"–when in fact, they are

54

$102, $102 and $102–and states that these payments come due every month.

The third reason is, "You don't attend the **meeting of creditors** or you do not provide all of the information to the trustee at the meeting of creditors." The fourth, which applies only in Chapter 13 cases according to the document, is if "you don't start making payments to the trustee starting 30 days after you file your case."  The fifth "reason" states, "If you have filed a **prior Chapter 7 or Chapter 13** bankruptcy and your automatic stay has been lifted for a creditor and/or case was dismissed previously, you may have to motion or request to make sure your automatic stay can remain or be reinstated on the prior creditor."

Attorney Booker tells the debtor that the debtor must "do" the credit counseling "prior to filing and 30 days after you file."  For one inexperienced with the requirements of the 2005 amendments to the Bankruptcy Code, this provision makes no sense.  The Code requires a debtor to take a pre-petition credit briefing within the 180 days preceding the date on which she files the petition.  That appears to be the "prior to filing" part of Attorney Booker's document.  The Code also requires that *after* the debtor files the petition, the debtor must complete a course in personal financial management.  The Code does not require the debtor to complete this course within 30 days–the Court has no idea where Attorney Booker got that number.  The Code requires only that the debtor must complete the course after filing the petition, and that if the debtor does not complete it, the debtor cannot obtain a discharge.

55

The statement informs the debtor that her case may be dismissed if she does not provide "all of the information to the trustee" at the meeting of creditors.  What information?

Finally, it tells the debtor that, "If you have filed a **prior Chapter 7 or Chapter 13** bankruptcy and your automatic stay has been lifted for a creditor and/or case was dismissed previously, you may have to motion or request to make sure your automatic stay can remain or be reinstated on the prior creditor."  It is true that if a debtor had a previous case, and one of her creditors in that previous case obtained relief from the automatic stay, and after that creditor obtained relief, the debtor dismissed the case, then she will face certain difficulties in her new case.  It is not necessarily true that her new case will be dismissed.  It is also true that, if the debtor files a case which gets dismissed, and then files another case within one year of the date the prior case was dismissed, the automatic stay in the new case expires after 30 days unless the debtor files a motion within that 30 days to have the stay extended. And if she has two cases dismissed within the year prior to filing the current case, she has *no* stay unless, within 30 days, she files a motion asking the Court to impose the stay.

That is not what the "Top Five Reasons" hand-out says.

<u>Bankruptcy Document Preparation Debtor Service Explanations and Understandings</u>

The next document is entitled, "Bankruptcy Document Preparation

56

Debtor Service Explanations and Understandings." The document starts out by indicating that debtors are responsible for paying the filing fees, and again incorrectly lists those fees as $299 for a Chapter 7 and $274 for a Chapter 13. The document tells the debtor that the debtor must pay these fees "at the time of the pro se filing if the filing fee is not waived by the court." It also states, "Please note in order for a fee waiver to be granted by court Debtor has to withstand strict poverty guidelines." It tells the debtor that if the debtor doesn't get a fee waiver, the debtor will have to pay the filing fee "in installments on a very strict schedule set by the court, sometimes with the first installment payment due within 30 days from the filing date." The debtor is informed that "if the court does not grant a filing fee waiver court may set a hearing date or make a filing fee waiver ruling based on the information in the filing documents," and tells her that if she misses any installment payments, the court will dismiss the case and she'll have to "motion" to reopen the case.

It makes no sense to tell a debtor that the debtor has to pay the filing fee on the day she files her petition "if the filing fee is not waived by the court." The debtor won't know whether the Court is going to waive the filing fee until several days, or weeks, after she files her petition. In reality, the debtor must do one of three things at the time she files her petition–pay the filing fee in full, file a request to pay the fee in installments, or file a request for the Court to waive the filing fee. If she chooses either of the latter two options, she need only file the application, and then wait for the Court's ruling on the application

57

to find out what to do next.

The document states that the debtor has paid for "the analysis of the debtor's financial information to ascertain if the they are suitable for Chapter 7 or Chapter 13 bankruptcy only, and that [the] law firm is not providing any additional service outside of this bankruptcy suitability analysis." The Court has discussed above its belief that Attorney Booker is not, in reality, analyzing debtors for suitability for bankruptcy. The form reiterates that the attorney can out source "professional form preparation" to an independent contractor, who has "the sole authority to do the complete bankruptcy document preparation." The form says that "every bankruptcy jurisdiction has a maximum amount that they are allowed to pay a professional document preparer and that this jurisdiction is $75.00 or ____.

The last sentence is not true. *Some* bankruptcy courts have established caps on the fees that a non-lawyer bankruptcy petition preparer may charge. Many have no such cap. (There are districts where there are no petition preparers in operation.) This district does cap petition preparer fees at $75. There is no "or"–the maximum fee the preparer can charge is $75.

The document tells the debtor that if any "additional documents or schedules" are needed "due to the Debtor forgetting to provide all of the information to the bankruptcy document preparer," it's the debtor's responsibility to complete the additional filings unless the debtor negotiates a new fee agreement with the firm. It states that "Debtor has 14 days after the

58

filing of a bankruptcy case to modify or complete the filing of any bankruptcy schedules or documents not included in the initial filing."

The last sentence is incorrect. The Federal Rules of Bankruptcy Procedure mandate that if a debtor does not file all of her schedules and other required documents with her petition, she must file them within fourteen days of the petition date. This procedure is sometimes called a "skeletal," or "bare-bones," or "short" filing–the debtor files only the three-page petition, the Exhibit D regarding credit counseling, and her creditor matrix. This procedure is supposed to be designed to allow a debtor caught off guard by some creditor action to file quickly–she receives notice that the foreclosure sale has been moved up and will take place two days from now, and she has to file quickly to stop the foreclosure. Unfortunately, it has morphed into a common practice.

So the debtor has fourteen days from the date she files her petition to file the schedules and other required documents. But the Code does not impose a deadline on amending, modifying or changing documents. A debtor can amend her schedules at any time–as long as she pays any required amendment fee.

The document states that "under no circumstances shall the law firm represent the Debtor for any bankruptcy services (i.e. attending meeting of creditors or any potential motion hearings) as it relates to the bankruptcy suitability analysis or the professional preparation of Chapter 7 or Chapter 13 documents." Again, without knowing what other services are available, a debtor cannot analyze what she's "giving up" in accepting Attorney Booker's

59

limited representation. The document also insists that the *bankruptcy preparer*–who is not identified by name–"did not and shall not provide any legal services as part of the preparation of the bankruptcy documents." The form states that the "law firm is not under any circumstances the attorney of record for the Debtor for the bankruptcy case." It states that "after attorney and/or law firm performs bankruptcy analysis service the legal service is concluded," and that "after bankruptcy preparer prepares bankruptcy documents based off what debtor provides that bankruptcy documentation service is concluded."

This paragraph, and others like it in other documents, is confusing even to the Court, not to mention to debtors. At the May 22 hearing, Attorney Booker vacillated between reminding the Court that he was a lawyer and that he was providing legal services, and telling the Court that he wasn't the lawyer for the debtor. The above language, upon which Attorney Booker relies to claim that the debtor gave her "informed consent," is mystifying, and does not make clear the scope of Attorney Booker's services.

The form advises the debtor that she must attend a meeting of creditors that usually is scheduled 30-45 days from the petition date, and that failure to attend this meting can result in dismissal. It is good that Attorney Booker advises debtors of this obligation, but helps little if the debtor has no idea what this meeting entails, or why it is important.

The form indicates that the debtor is paying for "at least 1 hour of legal service time at (i.e. $325.00 per hour) by our law firm to complete the

60

appropriate bankruptcy suitability analysis and the referral to a professional bankruptcy document preparer." Again, this makes little sense–if the billing rate is $325/hours, why are debtors being charged $220 or $249 for the entire scope of service that Attorney Booker is providing? If the debtor agrees to pay for "at least" one hour at $325, then it would seem that all debtors would be charged at least $325. This leaves aside the consideration of whether it is ethical under the Rules of Professional Conduct to charge a client $325 for an hour of work if the attorney performed only 20 minutes of work.

The form requires the debtor to acknowledge the importance of providing correct and complete information to "the bankruptcy preparer," and states that if the debtor fails to do so, "Debtor indemnifies and holds harmless bankruptcy preparer, attorney and/or law firm." It appears that Attorney Booker is attempting to insulate himself from liability for any incorrect or incomplete information a debtor may provide. But given the fact that he does not appear to be advising debtors about how to provide complete and accurate information, it is unlikely that such an attempt would be successful if it came under attack.

The document notifies the debtor that she must complete two "credit counseling courses–one "prior to the initial filing of the bankruptcy schedules and voluntary petition and a second one after the meeting of creditors to successfully obtain a discharge." As discussed above, this sentence is, at best, confusing, and at worst, wrong in advising the debtor about the obligation to

61

take the two courses. There is no requirement in the Code that the debtor has to take the second class "after the meeting of creditors." The debtor can take the financial management course the day after she files her petition, or even later on the day she files.

The document tells Chapter 13 debtors that "they need to start making plan payments to the trustee as stated in the Chapter 13 Model Plan 30 days after the filing of the bankruptcy case." In particular, the document states, Debtor understands that if they file a Chapter 13 that it can be complicated and may be pending for 3 to 5 years and thus may have adjustments as well as challenges to the confirmation of the plan as well as related motion hearings. Despite this, Debtor still requests to pursue the pro se option; meaning they want to provide their own representation without an attorney as it relates to this case.

This provision is particularly troublesome when one considers the "success rate," or lack thereof, of self-represented Chapter 13 debtors. Depending on the district, statistics indicate that less than 14% of pro se Chapter 13 debtors successfully complete their cases and receive a discharge. That number is on the high side–in the seven years the above-signed has been on the bench, it has yet to see a pro se debtor complete a Chapter 13 case.

The document states that a Chapter 7 case "can also be complicated in that it has time deadlines and may have challenges as well as additional

62

motion hearings."  It then includes the same "despite this" language used for Chapter 13 cases.

The document concludes by asserting that the debtor has reviewed and read all of the above, and tells the debtor to "handwrite the above statement if you understand," "I, the Debtor, attest that I have read, reviewed, initialed and agreed and understood all of the above paragraphs as well as the fee agreement and/or addendum."

### Debt Relief Intake Checklist

The Debt Relief Intake Checklist lists six documents labeled as "Document(s) Requiring Signature 1-6."  These are the Debt Relief Suitability Analysis Agreement, the Bankruptcy Document Preparation Explanation and Understandings Addendum, the Bankruptcy Disclosure Form, a "Client Authorization Form," the Money Order Authorization Form, and a Debt Relief Packet Acceptance Form.  It lists six further documents labeled as "Document(s) DON'T Require Signature 7-12."  These are:

"Bankruptcy Support Materials (various)," under which heading are subheadings listed "Credit Counseling," "Meeting of the Creditors Info Sheet," "Bankruptcy General Info Sheet (2 pages)," "Bankruptcy Help Desk Info Sheet," and "Info for People Who Don't Have Lawyers;"

"Debtor Exemption Sheet (Federal & State);"
"Do I Need an Attorney;"
"Bankruptcy Pamphlet;"
"Debtor Questionnaire (to be returned);" and
"Frequently Asked Questions Sheet."

63

Under the lines for the debtor's signature and printed name, the form states, "By signing this document, I declare under perjury that I have received and agree to read all of the above checked materials."

As discussed above, some of these documents are documents the debtor can obtain from the bankruptcy court free of charge. Others contain misleading information. The Court also is skeptical that having someone sign a document attesting, under penalty of perjury, that they read every page of a stack of documents will serve to insulate the provider of those documents for liability later on.

<u>Letter</u>

Finally, Attorney Booker attached a letter to the debtor, dated April 11, 2012. The letterhead states, "Legacy Legal Group, LLC, 828 N. Broadway, Suite 120, Milwaukee, WI 53202 (888) 620-RESQ (7377)." To the immediate left of the letterhead is the cartoon light bulb pictured on the light pole ads, with the words "Light Hero" underneath it. The "RE" line states that the letter relates to "Bankruptcy Suitability Analysis Service Completion."

The body of the letter states,

Dear Debtor:

The purpose of this letter is to confirm that we have reviewed your completed debt relief packet materials as well as the information that you have provided to our law firm and have concluded that your fact scenario is suitable to file a **Chapter 13** bankruptcy with the federal court in your jurisdiction. This analysis was based upon the information that you provided at the intake appointment,

64

in the completed questionnaire, after the intake appointment, including but not limited to any verbal conversations. This analysis was also based on any and all information you provided prior to you filing your bankruptcy documents.

The next step consists of the professional document preparer completing the preparation of your documents based upon the information that you have provided. Per your request, we are forwarding the bankruptcy document preparation fee to the preparer. As previously stated, you had the opportunity to select any bankrupt document preparer you wish and elected to have us forward your bankruptcy information to a professional bankruptcy document preparer in our network. The bankruptcy document preparer shall send you a completed copy of your bankruptcy documents for your execution within approximately 3 to 7 business days if you are not coming to our office at the above address.

**Once you receive your bankruptcy documents you will then need to take these bankruptcy documents and file them with the bankruptcy clerk's office at the <u>FEDERAL COURTHOUSE IN YOUR JURISDICTION</u> (See the Frequently Asked Questions handout in your packet for this address). It is very important that you file all of the required documents and schedules, including but not limited to the certificate of completion of credit-counseling and the bankruptcy voluntary petition.**

Once again, the credit-counseling certificate must be filed with the clerk of the bankruptcy court when you file. In addition, you must also complete the post-filing credit-counseling session and obtain a credit-counseling certificate at least 30 days after filing. If you had your certificate sent to our email address when you completed the credit-counseling we have included a complimentary copy for you with this letter.

**Upon successfully filing the bankruptcy documents a bankruptcy clerk will provide you with a case number, your assigned trustee and judge name, as well as the date of the <u>MEETING OF THE CREDITORS</u> that requires your <u>MANDATORY</u> attendance.** Please refer to all of the support documentation in your packet that you acquired and/or purchased at the intake session. Special attention should be given to all of the information that we have provided to you during this service,

65

especially the explanations and understandings document, frequently asked questions document as well as the document on how your case can be dismissed. Moreover, you have 14 days after filing to make any changes to your schedules. However, there may be an additional charge by the document preparer to make <u>any</u> changes.

**<u>IMPORTANT NOTICE</u>:** *Your case shall be dismissed if you are required to pay a filing fee and you do not make the required payment as set forth by the court. Please disregard this if you are granted a filing fee waiver by the court in the future. Please further note that just because you requested a filing fee waiver does not automatically mean that you will be granted one by the court. The court, not anyone else, controls and makes this decision. It is possible if you have requested a fee waiver request that the court may reject your request and order you to pay either in monthly installments or in a lump sum. Therefore, you should use extreme care in monitoring the status of the filing fee waiver request or filing fee installment plan so that your case will not be dismissed for failure to pay the filing fee as set forth by the bankruptcy court judge assigned to you.*

In conclusion, if you have any questions, including making changes to your documents, please call our law firm prior to filing your bankruptcy documents. In addition, we have concluded with this letter a debtor action checklist for your convenience. At this time our service is completed and it was a pleasure to assist you with our service. If you know of others who would benefit from this great service please let them know about our service. Thank you!

Sincerely,

Legacy Legal Group, LLP
(800) 852-4192

Enclosures

As with the other documents there is incorrect information in this letter,

as well as information which sheds light on another problem the judges have

66

encountered in Attorney Booker's cases. The last line of the credit counseling paragraph tells the debtor that if the debtor had the completion certificate e-mailed to Legacy Legal's offices, a courtesy copy of the certificate was being provided. This explains the number of situations the Court has encountered where the debtor–having been told that her case is about to be dismissed because she has not filed the credit counseling certificate–insists that Attorney Booker had done that for her, and yet there is no certificate on the docket. If Attorney Booker is allowing debtors to have their completion certificates e-mailed to him, then it is his obligation either to file the certificate promptly (within fourteen days of the petition date, as required by the rules), or get it to the debtor in time for the debtor to file it within fourteen days. There are cases in which neither of those things is happening, exposing debtors to having their cases dismissed.

Again, nothing in the law states that a debtor has only fourteen days to make changes or corrections to schedules. Interestingly, while Attorney Booker takes care to inform the debtor that the *petition preparer* will charge her for any changes, he does not mention that for many amendments to schedules, Congress requires the debtor to pay an amendment fee to the clerk.

Finally, it is commendable that Attorney Booker notifies debtors that the Court may not grant their applications for fee waivers, and that it may order them to pay in a lump sum or in installments. He neglects to mention that if the Court becomes aware that the debtor managed to scrounge up enough

67

money to pay Attorney Booker for the "suitability analysis," the Court will take that factor into consideration in deciding whether to waive the filing fee.

Attorney Booker's unbundling arrangement is inherently unreasonable, because the limitation on the scope of representation is not reasonable, and because many of the debtors do not give informed consent.

B. *Violations of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules*

The practices described above have resulted in Attorney Booker violating a number of provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and this Court's Local Rules. The fact that he has attempted to remedy some of those violations does not cure them, given that these attempts occurred only *after* the judges had identified the problems for him.

Attorney Booker violated § 527 of the Code in four ways. First, he violated that portion of § 527 which required him to provide the assisted person with the notice required by 11 U.S.C. §342(b)(1)–"a brief description of (A) chapters 7, 11, 12, and 13 and the general purpose, benefits, and costs of proceeding under each of those chapters; and (B) the types of services available from credit counseling agencies."

Second, he violated that provision of § 527 which required him to provide the assisted person with a notice advising the assisted person that she must disclose the replacement value of each cash asset, and that she must disclose

68

current monthly income (in the case of a Chapter 7) or disposable income (in the case of a Chapter 13.

Third, he violated that portion of § 527 which required him to provide the assisted person with the statement, outlined in the statue, describing in detail various portions of the bankruptcy process.

Fourth, he violated that portion of § 527 which required him, "to the extent permitted by nonbankruptcy law," to help the assisted person to learn how to value assets at replacement value, how to determine current monthly income or disposable income (terms of art under the statute), how to complete the list of creditors, and how to determine what property is exempt and to value exempt property.

Attorney Booker also violated § 528 of the Code, by failing to "clearly and conspicuously disclose in any advertisement of bankruptcy assistance services or the benefits of bankruptcy directed to the general public (whether in general media, seminars or specific mailings, telephonic or electronic messages, or others) that the services or benefits are with respect to bankruptcy relief under this title," 11 U.S.C. §528(a)(3), and to follow that disclosure with the words, "We are a debt relief agency.  We help people file for bankruptcy relief under the Bankruptcy Code," or words to that effect, 11 U.S.C. §528(a)(4).

Attorney Booker violated § 329 of the Code, when he failed to file a fee disclosure with the Court.  It is true that as of June 10, 2012, he has filed such

69

a disclosure in this debtor's case and in many others. That does not remedy his failure to abide by the law at the time that he filed this case. In addition, the compensation he received for representing this debtor–and many others–exceeded the value of the services provided.

By splitting fees with 1st Choice Bankruptcy Preparation, Attorney Booker violated § 504 of the Code.

By failing to sign the petition, Attorney Booker violated Fed. R. Bankr. P. 9011.

By failing to disclose his name on this and many other debtors' petitions after he had "made a major substantive contribution" to their petitions and schedules–or certainly some contribution–Attorney Booker violated Local Rule 9010.1.

C. *General Professionalism Concerns*

Attorney Booker has argued that he is an entrepreneur, who has created an innovative service to help those who desperately need legal services but cannot afford to hire a lawyer to represent them throughout the bankruptcy process. He argued that he had created a good "product" for his "customers," and that they benefitted from this "product." Attorney Booker's testimony at the May 22 hearing demonstrated that he has experience in marketing. His "Light Hero" advertising posters reflect that experience. He is an accomplished salesman, and he considers himself a creative businessman.

The law, however, is a profession. It is governed by ethical rules–lawyers

70

are held to a higher standard of conduct. The law requires advanced, specialized education, and continued training throughout the lawyer's career. Lawyers are "officers of the courts" in which they practice, and are required to be candid with the tribunal, to represent their clients zealously, to be truthful, and to act in the client's best interest. These standards don't preclude the lawyer from making a living–many lawyers comply with these standards while earning quite comfortable incomes. But marketing is not the end goal–practicing law to the benefit of the client is. While Attorney Booker is innovative, and has marketed his services with great success, he has not complied with his obligations as a professional. The people who hire him are not, as he calls them, "customers" who are purchasing a widget. They are "clients"–people who come to him for advice and services. He is obligated, as a result of his profession, to act for the good of those clients, to obey the law and to follow the ethical rules, and to stay abreast of the law in order to accurately advise those clients.

Attorney Booker also has argued that he operates his unbundled services program in order to help the neediest and most vulnerable of citizens. That should be an aspiration of every legal professional. There are many ways to accomplish that aspiration–by taking some cases on a *pro bono* or reduced fee basis, by volunteering at a free clinic (like the Marquette House of Peace clinic, or the Help Desk in this Court), by working for a legal services organization such as the Legal Aid Society of Wisconsin or Legal Action. Some lawyers

71

choose to help by becoming prosecutors–a position Attorney Booker once held. Some become State Public Defenders or Federal Defenders. Some become "poverty" lawyers, being willing to accept less pay than their corporate counterparts to represent clients of limited means. Countless others serve on non-profit boards, teach, write, do public speaking, and volunteer.

These efforts are not enough–for all of the laudable work described above, there remain far more people who do not get the legal help they need, and funding is cut each year to those entities that serve indigent populations.

The solution, however, is not to take money from desperate people for documents they could obtain free of charge, advice that is misleading or inaccurate, "analysis" that isn't analysis. This doesn't "help" the folks who need it. For many, including the debtor in this case, it actually *hurts* them.

Practicing law can be difficult and stressful. It can be more difficult and stressful when one operates, as Attorney Booker does, a solo practice. Being a lawyer and a bookkeeper and a purchasing manager and a compliance officer and a legal assistant can be exhausting, as this Court knows from personal experience. Attorney Booker has told the Court in the past that he is very busy, that his clients are difficult, and the Court has no doubt that these facts are true. Most bankruptcy lawyers are busy these days, however, and the majority still find ways to comply with their legal and ethical obligations.

No judge wants to, or enjoys, sanctioning a fellow lawyer. We all have made mistakes–plenty of them. But Attorney Booker's practices go beyond the

72

occasional mistake.  His practices harm his clients, burden the court, and damage the integrity of the legal system and litigants' trust in that system.  The Court cannot shirk the duty to acknowledge that fact out of empathy or sympathy for a colleague.

V.    Conclusion

For all of the above reasons, the Court concludes that, in addition to its May 22, 2012 order requiring Attorney Booker to refund to debtor Diane Jackson the $220 fee that he charged her, the Court **ORDERS**, pursuant to 11 U.S.C. §526 and 11 U.S.C. §105(a), that Attorney Booker is assessed a civil penalty of **$5,000** for his "clear and consistent pattern or practice of violating" §§ 527 and 528 of the Code, as well as for his violation of other provisions of the Code, the Federal Rules of Bankruptcy Procedure, and this Court's Local Rules.  The Court **ORDERS** that Attorney Booker is to pay this sanction to the United States Trustee by the close of business on **Friday, August 17, 2012**.  If Attorney Booker does not pay this sanction to the United States Trustee by that date, the U. S. Trustee may submit an affidavit to the Court, upon which the Court will schedule proceedings to determine whether Attorney Booker should be found in contempt of court.

#   #   #   #   #

74